**TRANS–BAY ENGINEERS & BUILD-ERS, INC., Plaintiff,**

v.

**James T. LYNN and Advance Mortgage Corporation, Defendants.**

**Civ. A. No. 74–1619.**

United States District Court, District of Columbia.

May 20, 1975.

---

Myron P. Curzan, J. Bradway Butler, Arnold & Porter, Washington, D. C., for plaintiff.

Robert M. Werdig, Asst. U. S. Atty., Washington, D. C., for defendant Lynn.

Morton W. Schomer, Washington, D. C., for defendant Advance Mortgage.

## OPINION AND ORDER

JOHN LEWIS SMITH, District Judge.

Plaintiff, a general contractor, brought this action against the mortgagee and the federal insurer of a low- and moderate-income housing project, seeking certain sums retained as a "holdback" during construction as well as payment for various modifications in the building plans. Plaintiff's motion for a preliminary injunction against the assignment of the mortgage to the Secretary of Housing and Urban Development (hereinafter Secretary or HUD) was denied by previous order of this Court. The case is before the Court on plaintiff's Motion for Partial Summary Judgment (as to the retention amount, with interest thereon), defendant Advance Mortgage Corporation's Motion for Summary Judgment, and defendant Lynn's Motion to Dismiss or, in the Alternative, for Summary Judgment.

Plaintiff Trans-Bay Engineers & Builders, Inc. is engaged in construction and general contracting work in the San Francisco Bay area. In 1971 Trans-Bay entered into an agreement to build a 231-unit housing project in Oakland, California for low- and moderate-income families. The construction contract was made with a non-profit, community-based group, More Oakland Residential Housing, Inc. (MORH).[1] MORH, the project owner, also entered into a mortgage and building loan agreement in the amount of approximately $6,000,000 with Advance Mortgage Corporation. HUD undertook to insure the mortgage between Advance Mortgage and MORH and to subsidize the project with monthly in-

1. Trans-Bay was also general contractor for a previous, adjoining MORH project completed in 1971.

terest reduction payments pursuant to section 236 of the National Housing Act, 12 U.S.C. § 1715z–1 (1970). The parties signed these basic agreements on December 22, 1971, at the "initial closing," and construction began soon thereafter.

Trans-Bay completed construction of the project on schedule, and on June 29, 1973, delivered to HUD the contractor's cost certification of the project. Relying on a provision in its construction contract with MORH, Trans-Bay sought release of the funds retained during periodic construction advances, amounting to 10% of project costs, or $467,301.[2] HUD officials notified Trans-Bay that approval of the owner's cost certification as well as final closing arrangements were necessary before the final amount due to Trans-Bay would be released from the mortgage proceeds. On August 10, 1973, MORH submitted the owner's cost certification to HUD, which was approved on October 10, 1973. Upon approval of the cost certification, Trans-Bay received approximately one-half of the retention amount. The remaining $233,653 has not been released despite requests by Trans-Bay and various negotiations carried on by the parties.

After September 1, 1973, MORH was unable to meet its interest payments to Advance Mortgage. Advance Mortgage filed a formal notice of project default with HUD on January 16, 1974, and several months thereafter informed HUD of its election to assign the outstanding mortgage to HUD, pursuant to statutory provisions. 12 U.S.C. § 1713(g); 24

C.F.R. § 207.258 (1974). Following this Court's denial of plaintiff's motion for a preliminary injunction, Advance Mortgage assigned the mortgage to HUD on December 24, 1974. Approximately $300,000 remained in undisbursed mortgage funds at the time of assignment.

A threshold matter to be considered is the jurisdiction of this Court over the action. Since the case at its core concerns matters of contract, there is no federal question jurisdiction under 28 U.S.C. § 1331(a), nor is 28 U.S.C. § 1337 applicable, providing for jurisdiction over proceedings arising under Acts regulating commerce. The fact that sections of the National Housing Act and the implementing regulations thereof are invoked by the parties does not transform a basic contract dispute into an action "aris[ing] under the . . . laws . . . of the United States." *See* Lindy v. Lynn, 501 F.2d 1367, 1369 (3d Cir. 1974). Nor can HUD-prepared forms or HUD's status as mortgage insurer serve to confer jurisdiction upon this Court.

12 U.S.C. § 1702, also relied upon, is not a jurisdictional grant. The statute's authorization of the Secretary in carrying out provisions of the National Housing Act to "sue and be sued in any court of competent jurisdiction" operates to confer standing, waive sovereign immunity, and provide an exception to the otherwise exclusive jurisdiction of the Court of Claims. By its own terms, 12 U.S.C. § 1702 presupposes jurisdiction in the court where a suit is brought.

2. *See* note 3 *infra*. Both the construction contract and the building loan agreement contained provisions governing the retention of the 10% amount. Article 3(B) of the construction contract states: "Each month after the commencement of work hereunder, the Contractor shall make a monthly request for payment . . . by the Owner for work done during the preceding month . . . . Subject to the approval of the Lender and the [Federal Housing] Commissioner, the Contractor shall be entitled to payment thereon in an amount equal to (1) the total value of classes of work acceptably completed; plus (2) the value of materials and epuipment not in-

corporated in the work, but delivered to and suitably stored at the site; less (3) 10 percent holdback and less prior payments."

Paragraph 4(a) of the building loan agreement provides similarly: "The Borrower shall make monthly applications . . . for advances of mortgage proceeds from the Lender. Applications for advances with respect to construction items shall be for amounts equal to (i) the total value of classes of the work acceptably completed; plus (ii) the value of materials and equipment not incorporated in the work, but delivered to and suitably stored at the site; less (iii) 10 percent (holdback) and less prior advances."

■■ Diversity jurisdiction under 28 U.S.C. § 1332 is the only appropriate jurisdictional base for this cause of action. Plaintiff is a California corporation. Defendant Advance Mortgage is a Delaware corporation with its principal place of business in Michigan. Defendant Secretary of HUD is to be considered as a citizen of the District of Columbia when acting in his official capacity. Garden Homes v. Mason, 249 F.2d 71, 73 (1st Cir. 1957) (Federal Housing Commissioner). The requirement of complete diversity between the parties is thus met in this action.

On the merits, Trans-Bay advances several arguments upholding its claim of entitlement to the retention amount plus interest. First, as a third party beneficiary to the building loan agreement between Advance Mortgage and MORH, Trans-Bay claims a contractual right to payment from the undisbursed mortgage proceeds. Second, in view of the surety nature of the retention fund, Trans-Bay asserts that its rights vested immediately upon completion of construction and thus cannot be destroyed by a subsequent default. Third, Trans-Bay relies upon traditional equitable lien and unjust enrichment theories in support of its right to recovery. The Court finds that a careful reading of the terms of the various contracts demonstrates the error of plaintiff's claim of entitlement to the re-

tention amount under the above theories, and accordingly rules for defendants in this cause.

■ Under Trans-Bay's construction contract with MORH, the retention sum was payable 30 days after completion of work, provided there was inspection and approval of the project, issuance of certificates of occupancy and permissions to occupy, and submission of a contractor's cost certification statement.[3] Trans-Bay complied with each of these conditions and asserts that it was unable to obtain full payment of the retention sum. However, it is not the construction contract that Trans-Bay is suing upon in this action. Trans-Bay relies upon the *building loan agreement* between Advance Mortgage and MORH for its cause of action against the mortgagee and HUD. Hence, recovery is conditioned upon the terms of that contract and Trans-Bay's ability to invoke those terms as a third party beneficiary. The clear, apparently favorable provisions of the construction contract cannot avail Trans-Bay in a suit based upon the building loan agreement.[4]

Trans-Bay cites Travelers Indem. Co. v. First Nat'l State Bank, 328 F.Supp. 208 (D.N.J.1971), in support of its claim to standing as a third party beneficiary and its present right to the retention amount. In *Travelers* the court held that the surety and trustees in bank-

---

3. Article 3(C) of the construction contract provides: "The balance due the Contractor hereunder shall be payable upon the expiration of 30 days after the work hereunder is fully completed, provided the following have occurred: (1) All work hereunder requiring inspection by municipal or other governmental authorities having jurisdiction has been inspected and approved by such authorities and by the rating or inspection organization, bureau, association or office having jurisdiction; (2) All certificates of occupancy, or other approvals, with respect to all units of the project have been issued by State or local governmental authorities having jurisdiction; and (3) Permissions to occupy (FHA Form No. 2485) for all units of the project have been issued by the Commissioner."

Article 10(C) of this contract states: "With its final application for payment, the

Contractor shall furnish to the Owner a completed 'Contractor's Certificate of Actual Cost', which shall be accompanied and supported by an independent public accountant's certificate as to actual cost (in form acceptable to the Commissioner)."

4. While the construction contract does not incorporate the provisions of the building loan agreement, it does specifically *notice* the terms of the agreement. Article 9(D) of the struction contract states: "The Contractor understands that the work under this contract is to be financed by a building loan to be secured by a mortgage and insured by the Commissioner, and that the terms of said loan are set forth in a Building Loan Agreement between the Owner as Borrower and ADVANCE MORTGAGE CORPORATION as Lender."

ruptcy of a construction company could sue the mortgagee and its assignee, HUD, for retainages withheld during construction. The court found plaintiffs to be creditor beneficiaries of a building loan agreement under both traditional contract doctrines governing third parties and explicit HUD regulations specifying the mortgagee's obligations. 328 F.Supp. at 211–14.

 This Court is in accord with the *Travelers* holding that a contractor may sue as a creditor beneficiary of a financing agreement made on its behalf. However, a third party beneficiary is bound by the terms and conditions of the contract that it invokes. If a promise is conditional the right of the beneficiary is a conditional right. 4 Corbin on Contracts § 818 (1951). The beneficiary cannot accept the benefits and avoid the burdens or limitations of a contract. Nor can the language of a single regulation be read in such an absolute way as to nullify conditions and restrictions imposed by a contract.[5] In short, the *Travelers* court either did not consider or did not have before it the limitations in the building loan agreement which are present in the instant case.

 Paragraph 4(e) of the building loan agreement provides: "The Lender shall, in accordance with the provisions of this agreement, continue to advance to the Borrower funds out of the proceeds of the loan as long as the loan remains in balance and *the Borrower is not in default hereunder or under the Note or Mortgage.*" (Emphasis added.) MORH concededly went into default on its mortgage payments, and thus Advance Mortgage was under no obligation to continue disbursing mortgage funds. As a third party beneficiary, Trans-Bay assumes the legal rights and position of the promisee, MORH. It could claim no entitlement *to further payment once* MORH had defaulted.

Trans-Bay attempts to avoid the default provision by asserting that its contractual right to the retention amount vested at a time prior to default by MORH; that is, on June 30, 1973, when Trans-Bay had completed construction and fulfilled all necessary pre-conditions to payment. It also contends that the Secretary's requirement of a final closing before full payment of construction retentions is unsupported by statute, HUD regulations, or pertinent contract provisions.

The requirement and the timing of final closing have not been codified in HUD regulations. However, several items do clarify the events necessary before final closing or its equivalent, final endorsement. HUD regulations require, "prior to final endorsement," the submission of the mortgagor's certificate of actual cost and the reduction of the mortgage to an amount no greater than the total certified cost. 24 C.F.R. §§ 221.550 (a), 221.555(a). Another regulation provides for final endorsement "[w]hen all advances of mortgage proceeds have been made and all the terms and conditions of the commitment have been complied with to the satisfaction of the Commissioner." 24 C.F.R. § 207.254(b). The building loan agreement itself does not mention final closing but does state, "The balance [of mortgage proceeds] due the Borrower hereunder shall be payable at such time after completion as the commissioner authorizes the release of the holdback." (Paragraph 4(b).) Also without specifying the time or circumstances of final closing, the FHA form on "Legal Requirements for Closing," utilized by the parties in the *initial* closing, lists the documents required for final closing, such as completion and cost certificates, instruments relating to the mortgage, request for final endorsement, etc. Lastly, the HUD Handbook on Construction Period to Final Closing for

5. 24 C.F.R. § 221.512, relied upon by plaintiff here, is identical to the regulation considered in the *Travelers* case. It states: "The mortgagee shall be obligated, as a part of the mortgage transaction, to disburse the principal amount of the mortgage, to, or for the account of the mortgagor or to his creditors for his account and with his consent."

Project Mortgage Insurance (1972) specifically prohibits the full release of the holdback amount until final closing.[6] The Handbook has no enforceable status, but neither is it a "secret" document as plaintiff claims.

 It is evident from the foregoing that Trans-Bay had notice of at least the necessity of a final closing, if not the timing of the event. Trans-Bay thus cannot contend that the final closing requirement was unexpected and unwarranted, or that it constituted an interference with contractual rights. As for the timing of the final closing, HUD admits that its cost certification review of the housing project was delayed several weeks because of insufficient personnel and other priorities, which in turn prevented an early final closing. Cost certification approval was not granted until October 10, 1973, although Trans-Bay had submitted the contractor's cost certification form on June 29, 1973, and MORH had provided the owner's cost certification form on August 10, 1973. Considering this delay from backlog problems as well as the comprehensive administrative review procedures required, such as cost comparisons with original estimates, examination of allowable costs and fees, disapproval of unacceptable charges, and investigation of possible identities of interest between subcontractors and the general contractor and/or mortgagor, the Court does not believe that a two-month delay in cost certification approval was unreasonable or designed to impair the rights of the mortgagor and the general contractor.

The average time for HUD certification processing was about six weeks during the period of June to December, 1973. (Affidavit of William L. Wallace, Acting Head, Cost Certification Section, HUD San Francisco Area Office.) An additional two or three weeks delay in the complicated certification process seems both understandable and justified in light of the circumstances of the present project. (*Ibid.*)

 After cost certification approval, final endorsement of the project could have taken place at any time; as previously stated, notice of default was not filed until over three months after approval (i. e., on January 16, 1974). However, on the date of certification, MORH's costs exceeded the balance of mortgage proceeds by $43,183. Because of this shortfall, resulting at least in part from MORH's invalid transfer of project funds to another housing project, the project was not able to go forward to final closing. (Affidavit of Betty J. Kercher, Senior Auditor, HUD San Francisco Region.) The shortfall was not subsequently cured, and the default by MORH removed the possibility of any eventual final closing on the project. Without final closing, Trans-Bay was not entitled to the retention sum under the building loan agreement upon which it relies. No rights vested in Trans-Bay during the period between submission or approval of cost certification documents and the default by MORH.

 Apart from its alleged contract claim, Trans-Bay asserts that surety and

6. Provision 4435.1 1–4 of the Handbook (Release of Holdback of Mortgage Proceeds) states: "In insurance of advance cases, the Building Loan Agreement requires the retention by the mortgagee of 10% of the construction proceeds at the time of each advance. This *retention is* one of the few sanctions HUD–FHA possesses to achieve as early a final closing of a loan as possible. Not until the time of the last advance is the holdback normally released. An earlier release of the funds could weaken the incentive on the part of the mortgagor and con-

tractor to take the necessary steps to permit a final closing."

Subsection e. states: "Once there has been substantial completion of the project, acceptable cost certification has been filed, and an early final closing scheduled, the Field Office Director may, in his discretion, release 50% or more of the holdback, but in no event the entire amount thereof, bearing in mind that the undisbursed holdback provides a major incentive to the contractor to complete his performance."

equitable lien principles entitle it to payment of the retention amount. In several cases, retention percentages have been viewed as an indemnity or surety fund to assure completion of construction and to protect the surety company if it is required to complete construction. *See, e. g.,* Pearlman v. Reliance Ins. Co., 371 U.S. 132, 136–42, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962); Henningsen v. United States Fidelity & Guar. Co., 208 U.S. 404, 410–11, 28 S.Ct. 389, 52 L.Ed. 547 (1908); Travelers Indem. Co. v. First Nat'l State Bank, 328 F.Supp. 208, 215–16 (D.N.J.1971). The present case, however, is distinguishable on its facts. Each of the above cases involved suits by a *surety company* to acquire retention amounts after payment had been made to laborers and materialmen following a contractor's default; the retainage sums were obviously not for the contractor's benefit, but principally for the protection of the surety. In *Pearlman* the Supreme Court specifically declined to award the retention amount to a defaulting contractor's trustee in bankruptcy—and in the present action, Trans-Bay stands in the shoes of a defaulting project owner. But most important of all, there are explicit contractual provisions and undertakings between the parties in this case, discussed *supra*, that govern the release of the retention amount. These terms were not present in the above cases, and cannot be nullified in the contracts before the Court by the invocation of the surety doctrine.

■ Likewise, equitable lien principles cannot create vested rights in Trans-Bay which are contrary to express and implied contractual undertakings. It may be that Trans-Bay has completed its construction obligations down to the last nail in the building, that it is wholly without fault in the project's financial failure, and that it has relied exclusively upon the mortgage fund as a source for payment of the retention sum. It may also be, as in G. L. Wilson Bldg. Co. v. Leatherwood, 268 F.Supp. 609, 622 (D. C.N.C.1967), that "[t]he United States at all times was fully acquainted with each step however minute, that took place from the very inception of the dealings herein, down to and including the absolute completion of the project." Still, equity will not set aside legal obligations in order to provide relief for parties later disadvantaged, nor will equity rewrite contracts to expand an insurer's liabilities or to restrict a promisee's risks and duties. In the present case, there has also been no convincing demonstration of the comparative value of Trans-Bay's performance vis à vis the total injury caused to HUD by the default. *See* 5A Corbin on Contracts § 1125 (1951) (Defaulting Contractor). Equitable principles are thus unavailing to plaintiff Trans-Bay.

■ Since HUD is not liable for the retention amount, Advance Mortgage, of course, is not. In addition, though, Advance Mortgage by its assignment of the mortgage to HUD has transferred "all rights and interests arising under the mortgage" to HUD, 12 U.S.C. § 1713(g)(1). An assignment ordinarily does not operate to relieve the assignor of duties under the contract. Here, however, statutory provisions and case law support the view that the mortgagee is no longer liable to suit after the mortgagor's default and the mortgagee's assignment to HUD, absent any impropriety on the mortgagee's part in regard to the contract. 12 U.S.C. § 1713(g); Lindy v. Lynn, 395 F.Supp. 769, 773 (E.D.Pa., 1974), aff'd, 515 F.2d 507 (3d Cir. 1975) (following assignment, Secretary "clothed with all the rights and obligations" of the mortgagee); Travelers Indem. Co. v. First Nat'l State Bank, 328 F.Supp. 208, 211 (D.N.J.1971). Moreover, HUD has expressly agreed to be "bound as successor to honor any obligation owed by the mortgagee pursuant to agreements approved by the Secretary in connection with this insurance transaction." (Opposition of Defendant Lynn to Motion of Plaintiff for Preliminary Injunction, p. 20.) Advance Mortgage is therefore entitled to a summary judg-

ment not only as to counts 1 and 2 (pertaining to the retention sum, plus interest), but also as to counts 3, 4, 5, and 6 of the complaint, which relate to contract modifications and additional construction costs incurred by Trans-Bay.