TRANS–BAY ENGINEERS AND
BUILDERS, INC., Appellant,

v.

Carla A. HILLS, Secretary of Housing
and Urban Development, et al.,

No. 75–1976.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 29, 1976.

Decided Dec. 30, 1976.

Myron P. Curzan, Washington, D. C., with whom J. Bradway Butler and Kenneth V. Handal, Washington, D. C., were on the brief for appellant.

Richard A. Graham, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Robert M. Werdig, Jr., Asst. U. S. Attys., Washington, D. C., were on the brief for federal appellees.

Morton W. Schomer, Arthur I. Cantor and Barry P. Rosenthal, Washington, D. C., were on the brief for appellee Advance Mortg. Corp.

Before McGOWAN, LEVENTHAL and ROBB, Circuit Judges.

Opinion for the Court filed by Circuit Judge LEVENTHAL.

LEVENTHAL, Circuit Judge:

Plaintiff-appellant, Trans-Bay Engineers & Builders, Inc. (Trans-Bay), is a minority owned business engaged in construction and general contracting work in the Oakland-San Francisco Bay Area. Trans-Bay seeks certain sums of money retained as a "holdback" during the construction of a housing project financed pursuant to § 236 of the National Housing Act, 12 U.S.C. § 1715z–1. The District Court entered summary judgment for defendants, the Secretary of Housing and Urban Development (HUD),[1] and Advance Mortgage Corp. (Advance).[2] In our view, Trans-Bay is conditionally entitled to recover the retained amounts, and we remand the case for further proceedings.

## I. BACKGROUND

In 1971, Trans-Bay contracted with More Oakland Residential Housing, Inc. (MORH), a non-profit corporation, to build a 231 unit housing project in Oakland, California for low and moderate income families. The

project, known as MORH Phase II, was to be federally insured and subsidized pursuant to § 236 of the National Housing Act.

### A. The Statutory Scheme

Section 236 was enacted by Congress to make rental housing available to low income families at reduced rentals. It is a two pronged program by which the Secretary (1) provides mortgage insurance for conventional private lenders, to induce them to make loans to builders and (2) subsidizes the monthly interest accruing on the mortgage loan, to the extent necessary to reduce the interest rate to an effective equivalent of one percent per annum.

If the § 236 project owner is a non-profit corporation, HUD will insure a mortgage covering 100 percent of the replacement cost of the project. This permits participation in the program by organizations with limited financial resources. Those without sufficient assets to cover the initial planning and development expenses are eligible for an HUD seed money loan. Since the interest on the construction loan is incorporated into the principal of the insured mortgage, § 236 projects generally require no operating income until they are completed.

Risk to the mortgage lender under § 236 is reduced not only by the mortgage insurance provided by HUD, but also by the lender's ability to sell the mortgage upon final endorsement to the Government National Mortgage Association (GNMA). For a fee paid at HUD's initial closing[3] the lender obtains a GNMA commitment to buy the mortgage at a fixed discount rate.

The rentals charged by the project owner vary according to family income, ranging from a minimum "basic rent," a rental covering pro rata operating expenses and interest payments, to the maximum "fair market rental," as determined without any

---

1. Carla A. Hills, Secretary since March 1975, was substituted for James T. Lynn during the litigation.

2. *Trans-Bay Engineers & Builders, Inc. v. Lynn,* 396 F.Supp. 265 (D.D.C. 1975).

3. The "initial closing" is a point in time prior to construction at which the parties to a given construction project execute the contracts and agreements defining their respective rights and responsibilities.

interest subsidy. However, amounts collected by the owner in excess of the basic rent must be turned over to HUD's residual receipts fund.

## B. *The Events of This Project*

The initial closing of this MORH Phase II project was held in the HUD office in San Francisco on December 22, 1971. It was preceded by nearly a year of preliminary negotiations between the parties. The project owner, MORH, is a non-profit California corporation embodying a consortium of local community groups in Oakland.[4] At the time of the initial closing, MORH's only significant asset was a previous § 236 housing project[5] which was itself subject to a 100% 40 year HUD insured mortgage. Advance Mortgage Corporation, a Delaware Corporation, provided the mortgage financing for the project. The Secretary was represented by the Federal Housing Administration (FHA), an organizational sub-unit of HUD.

Among the many documents executed at the initial closing were the Construction Contract, the Building Loan Agreement and the Regulatory Agreement.[6]

The Construction Contract, signed by Trans-Bay and MORH, called for a construction period of 17 months, commencing within 10 days of the initial closing, and payments on cost-plus-fixed-fee basis, not to exceed $4,703,790. The Building Loan Agreement, signed by MORH and Advance, defined the circumstances under which Advance would disburse loan funds to MORH. The Regulatory Agreement, signed by MORH and HUD, covered the owner's use of the loan funds, rental rates and many other obligations.

Construction began and proceeded in a timely manner. On May 25, 1973, MORH Phase II was inspected by the architects and certified to be one hundred percent completed. This certification was endorsed on May 31 by a representative of the Secretary.

The Construction Contract authorized the payment of monthly draws—incremental payments based upon completed construction, but minus a 10% retention or "holdback".[7] By June 12, 1973, all authorized construction draws had been paid to Trans-Bay. The retained amounts totaled $467,-

---

4. Six organizations are represented in MORH. They are: General & Specialty Contractors Association, Kaiser Urban Corporation, Oak Center Neighborhood Association, United Taxpayers and Voters League, West Oakland Health Council, and West Oakland Planning Committee. J.A. 158.

5. The earlier project, MORH Phase I, adjoins the site of the new project, MORH Phase II. The earlier project was also built by Trans-Bay.

6. All of the documents were apparently Federal Housing Administration (FHA) designed forms. They included the following documents:

| | |
|---|---|
| Construction Contract | FHA Form no. 2442A |
| Construction performance bond | FHA Form no. 2452 |
| Cost breakdown analysis | FHA Form no. 2328 |
| Building Loan Agreement | FHA Form no. 2441 |
| Regulatory Agreement | FHA Form no. 3135 |
| Deed of Trust Note | FHA Form no. 4104 |
| Deed of Trust | FHA Form no. 4104G |

7. Article 3, para. B of the Construction Contract reads as follows:

Each month after the commencement of work hereunder, the Contractor shall make a monthly request for payment (in quadruplicate on FHA Form No. 2448) by the Owner for work done during the preceding month. Each request for payment shall be filed at least ten days before the date payment is desired. Subject to the approval of the Lender and the [Federal Housing] Commissioner, the Contractor shall be entitled to payment thereon in an amount equal to (1) the total value of classes of the work acceptably completed; plus (2) the value of materials and equipment not incorporated in the work, but delivered to and suitably stored at the site; less (3) 10 percent holdback and less prior payments. The "values" of both (1) and (2) shall be computed in accordance with the amounts assigned to classes of the work in the "Contractor's and/or Mortgagor's Cost Breakdown", attached hereto as Exhibit "A". The Contractor agrees that no materials or equipment required by the Specifications will be purchased under a conditional sale contract or with the use of any security agreement or other vendor's title or lien retention instrument.

306. The Construction Contract provided that the holdback "shall be payable" to the contractor 30 days after construction was completed provided certain preconditions were met.[8] All of the preconditions were fully met within the thirty day period ending June 30, 1973.

Subsequent to June 30, 1973, Trans-Bay made numerous requests to Advance and HUD for the release of the $467,306. In October 1973, Advance and HUD agreed to release one half of that amount,[9] leaving $233,653 which is at issue here. HUD took the position that the remainder of those funds could not, in the normal course, be released until after a "final closing"[10] of the mortgage financing had occurred for the project. Such an event has never taken place, and is no longer possible because of the project owner's default.

MORH, the project owner, was unable to meet the interest payments it owed to Advance after September 1, 1973. Advance filed a formal notice of project default with HUD on January 16, 1974, and several months thereafter, informed HUD of its election to assign the outstanding mortgage to HUD, pursuant to statutory provisions. 12 U.S.C. § 1713(g). Both prior to that date and subsequently, the parties attempted to negotiate an arrangement which would permit MORH's default to be worked out and make all parties, including Trans-Bay,

whole. However, following the district court's denial of Trans-Bay's request for a preliminary injunction, Advance assigned the mortgage to HUD on December 24, 1974. Approximately $300,000 remained in the undisbursed mortgage fund at the time of assignment. Subsequently, HUD foreclosed the mortgage.

### C. Positions of Parties

Trans-Bay seeks recovery against the Secretary and Advance as a third party beneficiary to the Building Loan Agreement, and alternatively under theories of suretyship, and equitable lien/unjust enrichment.

The Secretary claims that MORH's default, the lack of privity between Trans-Bay and HUD, the absence of a final closing, and unclean hands preclude Trans-Bay's recovery. The Secretary also alleges a lack of jurisdiction in this court to decide this litigation.

### II. JURISDICTION

#### A. Tucker Act Limitation

We reject appellees' challenge to the district court's jurisdiction. It is argued that 28 U.S.C. § 1346(a)(2) limits the district court jurisdiction in suits based on contractual claims against the United States to claims not exceeding $10,000.[11]

---

**8.** Article 3, para. C states:

The balance due the Contractor hereunder shall be payable upon the expiration of 30 days after the work hereunder is fully completed, provided the following have occurred:

(1) All work hereunder requiring inspection by municipal or other governmental authorities having jurisdiction has been inspected and approved by such authorities and by the rating or inspection organization, bureau, association or office having jurisdiction;

(2) All certificates of occupancy, or other approvals, with respect to all units of the project have been issued by State or local governmental authorities having jurisdiction; and

(3) Permissions to occupy (FHA Form No. 2485) for all units of the project have been issued by the Commissioner.

**9.** The occasion of the October 1973 payment apparently was the final approval by HUD of the required cost certifications for the Project.

Trans-Bay had submitted its cost certification on June 29, 1973. MORH submitted its cost certification on August 10, 1973. However, HUD did not finally approve the cost certifications until October 10, 1973.

**10.** At final closing the financing arrangements mature into finally endorsed form, and any legal loose ends remaining from the construction project are taken care of.

**11.** 28 U.S.C. § 1346(a)(2) states in applicable part:

The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:

. . . .

(2) Any other civil action or claim against the United States, *not exceeding $10,000 in amount,* founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any

■ Ordinarily, persons suing the United States or a Government agency on a contract claim rely on 28 U.S.C. § 1346(a)(2), which waives the defense of sovereign immunity subject to certain limitations. However, Trans-Bay relies on the waiver of sovereign immunity provided in 12 U.S.C. § 1702 (part of the National Housing Act). Section 1702 provides that in carrying out the provisions of the housing law pertinent to this case, the Secretary of Housing and Urban Development shall "be authorized in his [her] official capacity, to sue and be sued in any court of competent jurisdiction, State or Federal." Since Trans-Bay need not rely on or invoke 28 U.S.C. § 1346 and its waiver of immunity, it is not restricted to the $10,000 limitation on the district court's jurisdiction provided by § 1346.[12]

There is authority to the effect that § 1702 couples a waiver of sovereign immunity and a grant of subject matter jurisdiction in the federal district court.[13] There are also rulings that it is not a grant of jurisdiction.[14]

■ We need not pursue this question for we have other statutes that establish jurisdiction in the district court, once the barrier of sovereign immunity is hurdled by § 1702. In view of the waiver of sovereign immunity, the court has authority to dispose of this action even though a judgment against the Secretary establishing plaintiff's entitlement may affect funds in the accounts of the Government's officers charged with HUD's application of funds.

### B. Diversity Jurisdiction

■ We begin by approving the district court's ruling that there is diversity jurisdiction under 28 U.S.C. § 1332. HUD asserts (Br. at 20) that "the Secretary, indeed the United States, is not a citizen of any state for the purpose of establishing diversity jurisdiction." This suit is against the Secretary in her official capacity as provided by 12 U.S.C. § 1702. For diversity purposes in such cases, the Secretary's residence is properly found in Washington, D.C. See Garden Homes v. Mason, 249 F.2d 71, 73 (1st Cir. 1957), cert. denied, 356 U.S. 903, 78 S.Ct. 562, 2 L.Ed.2d 580 (1958); EMMCO Insurance Co. v. Frankford Trust Co., 352 F.Supp. 130, 133 (E.D. Pa.1972).

■ The Secretary then argues that MORH, the project owner, is an indispensable party defendant, and that the presence of this California corporation as a defendant would destroy the diversity with plaintiff Trans-Bay, likewise a California corporation.

We do not find MORH indispensable. Rule 19 of the Federal Rules of Civil Procedure covers the "joinder of persons needed for just adjudication." [15] The facts in this

---

express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.
(Emphasis added).

Contract claims in excess of $10,000 may be brought in the Court of Claims pursuant to 28 U.S.C. § 1491.

**12.** *Ferguson v. Union National Bank,* 126 F.2d 753 (4th Cir. 1942); *Ghent v. Lynn,* 392 F.Supp. 879 (D.Conn.1975); *George H. Evans & Co. v. United States,* 169 F.2d 500, 502 (3rd Cir. 1948); *James T. Barnes & Co. v. Romney,* 334 F.Supp. 657 (E.D.Mich.1971); *Travelers Indem. Co. v. First National State Bank of N.J.,* 328 F.Supp. 208 (D.N.J.1971).

**13.** *Ferguson v. Union National Bank,* 126 F.2d 753 (4th Cir. 1942), *George H. Evans & Co. v. United States,* 169 F.2d 500, 502 (3rd Cir. 1948), *James T. Barnes & Co. v. Romney,* 334 F.Supp. 657 (E.D.Mich.1971). *Accord, Hartford Accident and Indemnity Company v. Town of Saltillo, Miss.,* 371 F.Supp. 331 (N.D.Miss.1974).

**14.** *E. g., American Fidelity Fire Insurance Company v. Construcciones Werl, Inc.,* 407 F.Supp. 164, 186 (D.V.I.1975); *Ghent v. Lynn,* 392 F.Supp. 879 (D.Conn., 1975); *Marcus Garvey Square, Inc. v. Winston A. Burnett Construction Co. No. C–73–0567 RFP* (N.D.Cal., Dec. 31, 1975); *Harms v. Federal Housing Administration,* 256 F.Supp. 757 (D.Md.1966); *Choy v. Farragut Gardens,* 131 F.Supp. 609, 613 (S.D.N.Y.1955).

**15.** *Rule 19. Joinder of Persons Needed for Just Adjudication*

*(a) Persons to be Joined if Feasible.* A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be

case are generally uncontested. Trans-Bay has fully performed according to the construction contract. The legal issue of whether the Secretary is liable to Trans-Bay despite MORH's default has little to do with MORH. MORH has no significant assets. Realistically, Trans-Bay's only potentially effective remedy is against the Secretary. The requested relief is possible without MORH's presence. Thus, MORH is not indispensable.

### C. *Federal Question Jurisdiction*

We also believe, differing from the contrary dictum of the district court, that the court had jurisdiction under 28 U.S.C. § 1331(a), the grant of "federal question" jurisdiction.

 In ruling against federal question jurisdiction, the district court treated this case as a mere suit on contract. It relied on *Lindy v. Lynn,* 501 F.2d 1367, 1369 (3rd Cir. 1974), but that was concerned with the interpretation of a set of admittedly valid and binding contracts. Here we are asked to determine whether the Secretary of HUD has an obligation to plaintiff Trans-Bay that is not rooted in a contract between them, but rather on equitable rights generated by HUD's course of activities pursuant to federal statutes, including the contracts it has sponsored, and prescribed for others,

as a condition of federal aid. The claim of right is dependent on federal common law. *U. S. v. Chester Park Apartments, Inc.,* 332 F.2d 1 (8th Cir. 1964), *cert. denied,* 379 U.S. 901, 85 S.Ct. 191, 13 L.Ed.2d 176 (1964). *U. S. v. View Crest Garden Apts., Inc.,* 268 F.2d 380 (9th Cir. 1959), *cert. denied,* 361 U.S. 884, 80 S.Ct. 156, 4 L.Ed.2d 120 (1959). *See Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); *U. S. v. Seckinger,* 397 U.S. 203, 209–10, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970); *U. S. v. Allegheny County,* 322 U.S. 174, 183, 64 S.Ct. 908, 88 L.Ed. 1209 (1944). Congress enacted § 236 of the National Housing Act to encourage participation of private capital in housing construction and rehabilitation. The success of this program clearly depends on the rights and obligations of the various parties, including the supervisor and guarantor, HUD. What governs their rights is not only the contracts they hold, but also the responsibilities of HUD, not limited to contracts signed by HUD, but including responsibilities and duties generated by its activities in furtherance of the Housing Act, including the sponsorship and prescription of contracts signed by others. Compare *Clearfield Trust, supra,* with *Bank of America National Trust and Savings Ass'n v. Parnell,* 352 U.S. 29, 77 S.Ct. 119, 1 L.Ed.2d 93 (1956). A claim "arises under the laws of the United

---

accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.

(b) *Determination by Court Whenever Joinder not Feasible.* If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the

action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

(c) *Pleading Reasons for Nonjoinder.* A pleading asserting a claim for relief shall state the names, if known to the pleader, of any persons as described in subdivision (a)(1)–(2) hereof who are not joined, and the reasons why they are not joined.

(d) *Exception of Class Actions.* This rule is subject to the provisions of Rule 23.

States" if the disposition of issues stated in the complaint requires the application of federal common law. *Illinois v. City of Milwaukee,* 406 U.S. 91, 100, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972). There is federal question jurisdiction under 28 U.S.C. § 1331(a).[16] As is often the case, the basis of jurisdiction will be more clear when we discuss the merits of the federal common law issue in this case.[17] We turn to the merits.

### III. MERITS

It is undisputed that Trans-Bay fully performed under the Construction Contract. However, Trans-Bay is not suing on the construction contract; neither Advance nor the Secretary was a party to that contract.

We take up, in turn, Trans-Bay's three arguments to support its claim of entitlement to the retention amounts. First, as a third party beneficiary to the Building Loan Agreement between Advance and MORH, Trans-Bay claims a contractual right to payment of the retention fund. Second, Trans-Bay claims entitlement under "doctrines that vest retention amounts in the party completing the construction project." Third, Trans-Bay claims entitlement under traditional equitable lien/unjust enrichment doctrines.

### A. *Contractor as Third Party Beneficiary under the Building Loan Agreement*

■ The District Court correctly ruled that Trans-Bay could sue as a third party beneficiary of the financing agreement made on its behalf. *Travelers Indem. Co. v.*

First National State Bank of N.J., 328 F.Supp. 208, 211 (D.N.J.1971); *American Fidelity Fire Insurance Company v. Construcciones Werl, Inc.,* 407 F.Supp. 164, 180–83 (D.V.I., 1975). See *Avco Delta Corporation Canada LTD v. United States,* 484 F.2d 692, 701–04 (7th Cir. 1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974).

■ The court properly stated that a creditor third party beneficiary was bound by the terms and conditions of the contract that it invoked. 396 F.Supp. at 270. The beneficiary cannot accept the benefits and avoid the burdens or limitations of a contract.

However, the District Court then ruled that recovery for Trans-Bay was precluded by two "contractual" conditions: the absence of a final closing and MORH's default. We disagree.

#### 1. *Absence of final closing*

Much is made of the absence of a final closing in this case.[18] The Building Loan Agreement does not mention a final closing as a prerequisite to the payment of the retention amounts. Paragraph 4(b) of the Building Loan Agreement merely states in pertinent part that:

> The balance [of the mortgage proceeds] due the Borrower hereunder shall be payable at such time after completion as the Commissioner authorizes the release of the holdback.

The District Court found the lack of a final closing to be a bar to the release of the holdback based on statements in a HUD

---

**16.** We find it unnecessary to consider the remaining jurisdictional grounds presented by the plaintiff. An alternative base of jurisdiction may be available under the doctrine announced in this circuit, that the review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706, confer an independent basis of subject matter jurisdiction on the district courts in appropriate cases. *Pickus v. United States Board of Parole,* 165 U.S.App.D.C. 284, 507 F.2d 1107 (1974), and cases cited therein. Plaintiff also alleges jurisdiction under 28 U.S.C. § 1337 (Commerce Clause) and 28 U.S.C. § 1361 (mandamus).

**17.** It might be argued that this ruling on federal question jurisdiction is the only clear holding in this decision, in view of some possibility that federal common law does not apply to cases where jurisdiction depends on diversity of citizenship. We are not of that view. See generally Wright, Federal Courts, 3rd ed., § 60 (1976).

**18.** As to nature of final closing, *see supra* note 10.

handbook,[19] even though the court acknowledged that the handbook "has no enforceable status",[20] and even though the handbook was published nearly a year after the contracts in this case were signed.[21] The court also relied somewhat on HUD regulations that discuss events that should be completed before there can be a final closing, but do not mention that payment of the holdback amounts would be contingent on the final closing.[22]

The District Court found that HUD's expectation in 1973 that payment of the retained funds would be contingent on a final closing was not a "secret." Perhaps so, but that does not mean that HUD's unilateral expectation should be controlling.

■ The contractual documents signed at the initial closing in 1971 were part of a package for a single project. Where two or more written agreements are contemporaneously executed as part of one complete package, they should be construed together and should be construed as consistent with each other, even if not all the agreements are signed by the same parties.[23]

■ We think it fair to say that the District Court's decision reflects an analysis of the rights and obligations of the parties not from the documents then signed and regulations then in existence but backwards, from a provision in the HUD handbook, though without enforceable status, and published unilaterally some time later. Looking at the matter prospectively, what we have is the specific and unambiguous language in the Construction Contract which states that the holdback "shall be payable" within 30 days (conditioned on the occurrence of specific listed events).[24] The contemporaneous Building Loan Agreement says no more than that the proceeds due the borrower shall be payable "at such time after completion as the Commissioner authorizes the release of the holdback." The HUD regulations do not say that the release of the holdback shall be deferred until final closing. Here, where HUD has certified completion of construction, we cannot find in any fair reconstruction of intent and reliance a basis for a ruling that the absence of a final closing was a complete bar to recovery of the holdback amounts. This result seems especially appropriate where, as here, all the contracts and forms were drafted by HUD, and the canon that documents be construed against the draftsmen[25] is reinforced by the reality that HUD was engaged in a program of inducing private construction for the public benefit, and had effective control over all agreements and documents.

## 2. Borrower's Default

The second "contractual" bar to recovery under the third party beneficiary theory cited by the District Court was paragraph 4(e) of the Building Loan Agreement which states in applicable part:

> The Lender, shall, in accordance with the provisions of this agreement, continue to advance to the Borrower funds out of the proceeds of the loan as long as the loan remains in balance and the Borrower is not in default hereunder or under the note or mortgage."

■ As a third party beneficiary, Trans-Bay could not claim entitlement to further

---

**19.** 396 F.Supp. at 271 n.6.

**20.** 396 F.Supp. at 271.

**21.** It was published in October, 1972, J.A. 328–54.

**22.** 396 F.Supp. at 270.

**23.** *In re Steen,* 509 F.2d 1398, 1403 (9th Cir. 1975); *Peterson v. Miller Rubber Co.,* 24 F.2d 59, 62 (8th Cir. 1928), *cited with approval, St. Paul Fire & Marine Insurance Co. v. Tennefos Construction Co.,* 39⌐ F.2d 623, 628 (8th Cir.

1968). *Accord John W. Johnson, Inc. v. Basic Construction Co.,* 139 U.S.App.D.C. 85, 93 n.18, 429 F.2d 764, 772 n.18 (1970).

**24.** *See supra* note 8.

**25.** *United States v. Seckinger,* 397 U.S. 203, 210, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970); *John W. Johnson, Inc. v. Basic Construction Co.,* 139 U.S.App.D.C. 85, 92 n.11, 429 F.2d 764, 771 n.11 (1970).

payment once MORH had defaulted. However, Trans-Bay asserts that a right to the retention amount vested under the contract on June 30, 1973, prior to default by MORH. The District Court had no occasion to consider this Trans-Bay contention.[26]

As we take up the question whether MORH was in default prior to June 30, 1973, we find the record somewhat unclear.

The affidavit of Robert Kalish, HUD's Deputy Director of the Office of Loan Management states that "[t]he interest payments due September 1, 1973, and thereafter were not paid by MORH, thereby constituting a default under the Deed of Trust and the Building Loan Agreement." J.A. 170. This would indicate that there was no earlier default.

Appellee's counsel argues that prior to June 30, 1973, MORH commingled the funds of its two projects, MORH Phase I and MORH Phase II, and that this commingling caused an out of balance condition that constituted a technical default under para. 4(e) of the Building Loan Agreement, that the condition was never corrected, and subsequently led to the default in interest payments.

There is scant support in the record for this argument. The affidavit of Betty Jo Kercher, a Senior Auditor for HUD states only that the commingling of funds and the subsequent use of the funds (for HUD related items) violated section 7(b) of the Regulatory Agreement,[27] not that the loan was out of balance, constituting a material breach of the Building Loan Agreement. J.A. 173. HUD's own "Statement of Material Facts as to which the Secretary of HUD Contends There is no Genuine Issue"

makes no statement that there was an out of balance condition. J.A. 100.

Even if there was an out of balance condition, there is some doubt whether the condition that existed constituted an immediate material breach of the Building Loan Agreement, a doubt reinforced by the fact that MORH paid the June, July and August interest payments.

The record clearly does not support summary judgment for HUD on this point. While it seems probable that Trans-Bay is entitled to judgment, we think the state of jurisprudence is such that this should not be initiated by an appellate court. HUD is entitled to every possible reasonable inference before summary judgment can be granted in favor of Trans-Bay.[28] Since the record does not establish the facts concerning the out of balance condition, we must remand for further proceedings unless judgment for Trans-Bay is required on the basis of one of its two remaining contentions.

### B. Right to Retentions of Party Completing Construction

Apart from its contractual claim, Trans-Bay argues that it is entitled to the funds under doctrines that vest retention amounts in the party completing the construction. It cites cases involving suits by surety companies to recover amounts after the surety had completed projects left undone by defaulting contractors, e.g., Pearlman v. Reliance Insurance Co., 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962), Prairie State Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896), Henningsen v. United States Fidelity & Guaranty Co.,

---

26. As already noted, the District Court, erroneously in our view, decided that the contractual right to the holdback did not vest until final closing was possible (determined to be when the Owner's Cost Certificate was approved by HUD on October 10, 1973).

27. Section 7(b) of the Regulatory Agreement states:

Owners shall not without the prior written approval of the Commissioner:

 . . . . .

(b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds, except for reasonable operating expenses and necessary repairs;

28. U. S. v. Diebold, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Bouchard v. Washington, 168 U.S.App.D.C. 402, 405, 514 F.2d 824, 827 (1975); Bloomgarden v. Coyer, 156 U.S.App.D.C. 109, 114–15, 479 F.2d 201, 206–07 (1973).

208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908).

■ The Government is correct in saying that the sureties cases may be distinguishable, since a surety completing construction after default has special equities, and the encouragement of such surety completion establishes a strong policy basis for these rulings. Still, the surety cases do mark an attitude, that the Government's holdback rights are not narrowly defined by the strict contractual provisions, and that overarching equities may be taken into account.[29] We turn to the issue whether appellant Trans-Bay has an equitable claim to the retained amounts.

### C. Equitable Doctrines; Lien/Unjust Enrichment

Trans-Bay argues it is entitled to the holdback amounts by application of traditional doctrines of equity, doctrines of equitable lien and unjust enrichment. It asserts that the Secretary has been unjustly enriched by the value of Trans-Bay's uncompensated construction services. We agree.

In the present context this is a matter of federal common law, and thus we do not discuss arguments based on the special features of California law. See Part II C, supra.

HUD, was not merely the mortgage insurer for MORH Phase II, it was the guiding spirit behind the entire project. The record reveals a very high level of involvement by HUD. HUD encouraged the formation of MORH, and groups like MORH, in an attempt to build community support for their projects. HUD was involved in this project from the beginning, when it furnished interest-free seed money to MORH to assist in the design and development work prior to the initial closing. The project could not have started without this seed money.[30]

The construction plans were inspected and approved by HUD at many stages. Normally, review begins with the earliest sketches of the architect, and continues throughout the design stage until the project is completed. All requests for construction changes must be approved by HUD. HUD inspectors monitor the progress of the construction, and determine the contractor's compliance with the drawings and specifications. All construction progress payments must be approved by HUD.

All the contracts and forms used in this transaction were drafted by HUD. Even the prospective tenants must apply to the owner of the project on a HUD form.

HUD's regulatory agreement prescribes rules for the owner's handling, use and disbursement of all loan money. HUD can and did audit the owner's financial records to determine compliance with the detailed regulatory agreement.

HUD endorsed the certificate of final completion, issued permissions to occupy the units, and approved the contractor's cost certificate.

The fact that the project owner selected and succored by HUD went into default does not negate HUD's responsibility and involvement. The term "responsibility" is not to suggest that HUD was at fault. This was a program in the public interest that entailed inherent risk. But it was HUD's overarching endeavors and control that limited the risks to others and established its own responsibility for equitable conduct.

It is neither fair nor realistic to treat HUD as a mere mortgage insurer in this transaction, defining its exposure solely on the basis of the mortgage insurance document. This was not a typical marketplace transaction where the contractor relied on

---

29. An extended analysis of the cases and the courts' approach is provided by Judge Young's opinion in *American Fidelity Fire Insurance Co. v. Construcciones Werl, Inc.*, 407 F.Supp. 164, 191–97 (D.V.I.1975).

30. *See,* for example, the affidavit of Donald A. Duffy, J.A. 157.

the reputation and financial integrity of the owner to pay the construction costs. The owner here was a non-profit community based organization without any significant assets, a fact known to all parties. The court put it pithily in *F. W. Eversley & Co. v. East N.Y. Non-Profit HDFC*, 409 F.Supp. 791, 796–97 (S.D.N.Y.1976): These "non-profit, no asset corporations were 'creatures of HUD.'" They are not ordinary private commercial ventures, but products of and means for government programs. They were created and fully financed to carry out a government inspired social purpose of rehabilitating and constructing housing for low income families. The mortgage company was fully insured on its loan by HUD. HUD had the remedy of foreclosure. The owner's losses were limited to the project itself—which was 100% financed including seed money. Under HUD's view, the contractor alone is not protected, and is indeed even unable to consider the mechanic's lien available in ordinary commerce.[31] HUD argues that this loss to the contractor, who fully performed, resulted from a conscious contractual allocation of risk by all the parties involved, and was the result intended by Congress. This simply does not square with our appraisal of the realities, or our notions of good sense and fair dealing.

Trans-Bay claims that it had been led to expect that HUD would make good on any sums rightfully due it under the construction contract. We see little that would lead to a contrary expectation. As the affidavit of John Williams, the Executive Director of the Redevelopment Agency of the City of Oakland, California states, without the ex-

pectation that HUD would cover such costs, no general contractor would ever agree to build a non-profit Section 236 project. J.A. 263, 267.

We do not hold that a governmental agency or administrator would be liable for unpaid sums any time the agency or administrator insures a mortgage. Most such projects involve presumptively credit worthy owners in traditional marketplace activities. There, the contractors rely on their own assessment of the owner's solvency and reputation, and take their contractual chances as they see fit.

■ But here, the no-asset owner was created and permitted to enter into the agreements for the convenience of the government in effectuating the section 236 program. A court of equity has the power to forestall a cosmetic fraud based on the niceties of the contractual arrangements constructed by HUD, and to avoid unjust enrichment from the services rendered.[32] *F. W. Eversley & Co. v. East N.Y. Non-Profit HDFC*, 409 F.Supp. 791, 795 (S.D.N.Y.1976), *American Fidelity Fire Insurance Co. v. Construcciones Werl, Inc.*, 407 F.Supp. 164, 184 (D.V.I.1975), *G. L. Wilson Building Company v. Leatherwood*, 268 F.Supp. 609 (W.D.N.C.1967).[33]

■ The undisbursed mortgage proceeds created by the holdback constitutes an identifiable res subject to the control of the Secretary upon which an equitable lien can be placed, and the Secretary's obligation to respect that lien can be declared. *Eversley, supra*, 409 F.Supp. at 799; *Ameri-*

---

**31.** Article 7 of the Construction Contract states:

"Article 7—Waiver of Lien or Claim

"The Contractor shall file no mechanic's or materialman's lien or maintain any claim against the Owner's real estate or improvements for or on account of any work done, labor performed or materials furnished under this Contract."

**32.** If MORH has assets, equity would require the assignment to the Secretary of any rights of Trans-Bay remaining against MORH after the imposition of the equitable lien on the Secretary.

**33.** Two recent district court cases have refused to impose equitable liens in similar circumstances. *U. S. v. Lincoln Neighborhood Community Association*, No. TCA 73–30 (N.D.Fla., Tallahassee Div., Oct. 17, 1975), relied on the District Court's reasoning in this case, *Trans-Bay*, to defeat the lien; *Marcus Garvey Square, Inc. v. Burnett Construction Company*, No. C–73–0567 RFP (N.D.Cal., Dec. 31, 1975), held that state law was controlling, erroneously in our view, and denied the equitable lien based on California statutory language.

can *Fidelity, supra*, 407 F.Supp. at 183; Affidavit of Fred Pfaender, J.A. 186–87.

■ Though we find the appellant entitled to an equitable lien on the retained amounts, we stop short of ordering summary judgment.

The Secretary has introduced a colorable argument that Trans-Bay does not come to this court with clean hands, and that equity should be stayed. Much is made of the fact that the President of Trans-Bay sat as one of nine members on the board of MORH. The implication is that Trans-Bay is somehow responsible for MORH's default and should therefore be denied recovery.

It is true that Trans-Bay's President sat on MORH's Board of Directors during some of that period, but it was with the full knowledge and acquiescence of HUD.[34] The individual represented an association of minority contractors, one of the six groups which comprise MORH.[35] The record is devoid of any allegation of wrongdoing by this individual. In fact, one affidavit states that it was erroneous to suggest that the individual or Trans-Bay ever had or now has any control over the MORH Board of Directors.[36] Further, it is difficult to see how Trans-Bay could profit from MORH's default; the record indicates that MORH Phase III was in the planning stage and we assume that Trans-Bay would have had the inside track for that business based on its performance in MORH Phases I and II.

Even indulging every inference in favor of HUD, it is improbable that such a charge would defeat the very strong equity in favor of recovery in this case. However, this Court did not hear argument on this issue. We think it prudent to avoid an appellate ruling at this juncture that as a matter of law there is *no* reasonable possibility that a claim of unclean hands could lie. We remand to the district court for the determination of this issue, confident that it will implement the decision of this court with full cognizance of its own obligations as a court of equity.

## IV. ADVANCE MORTGAGE CORP. DISMISSAL

■ The District Court correctly dismissed all counts against the Advance Mortgage Corp. Advance assigned the mortgage, and the Building Loan Agreement to HUD on December 24, 1974, and thereby transferred all rights and interests arising under the mortgage to HUD, pursuant to 12 U.S.C. § 1713(g). HUD is in a position to present any arguments that Advance might have presented in this case, and HUD admits that it is bound as a successor in interest to honor any obligations owed by Advance. J.A. 72, 171–72. *Lindy v. Lynn*, 395 F.Supp. 769, 773 (E.D. Pa.1974), *aff'd* 515 F.2d 507 (3rd Cir. 1975), *Travelers Indem. Co. v. First National State Bank of N.J.*, 328 F.Supp. 208, 214 (D.N.J.1971).

## V. JUDGMENT

We hold that Trans-Bay is entitled to $233,653.00 plus interest from June 30, 1973, unless the Secretary both (a) establishes "unclean hands" sufficient to defeat the equitable lien, *and* (b) successfully proves a substantial breach of the Building Loan Agreement by MORH prior to June 30, 1973.

The summary judgment as to Advance Mortgage Corp. is affirmed.

Affirmed in part, vacated in part, and remanded for proceedings not inconsistent with this opinion.

*So ordered.*

---

**34.** J.A. 162.

**35.** *See* footnote 4, *supra*.

**36.** J.A. 161.