VAN–TEX, INC., et al., Plaintiffs

Industrial Indemnity, Inc., Plaintiff-Appellee,

v.

Samuel R. PIERCE, Jr., Secretary, Department of Housing and Urban Development, Defendant-Appellant.

No. 82–1002.

United States Court of Appeals, Fifth Circuit.

April 25, 1983.

---

Lenore C. Garon, Atty., Dept. of Justice, Civ. Div., Commercial Litigation, Susan M. Chalker, Anthony J. Steinmeyer, Attys., Appellate Staff, Civ. Div., Dept. of Justice, Washington, D.C., for defendant-appellant.

Baker & Botts, Ralph S. Carrigan, Houston, Tex., for Indus. Indem. Co.

Before BROWN, GOLDBERG, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

We decide today three cases dealing with the rights to construction holdbacks on projects financed by HUD-insured mortgages. In this case, Industrial Indemnity, the surety of a contractor on a § 221(d)(4) (12 U.S.C. § 1715*l*(d)(4)) project, brought suit against HUD to recover holdbacks after the mortgagee had foreclosed and assigned the project to HUD. On cross-motions for summary judgment relying upon a stipulation of facts referencing testimony and exhibits, the district court entered judgment for Industrial Indemnity on theories of third-party beneficiary and unjust enrichment. We reverse.

### Facts and Procedural History

In 1971, HUD insured advances by Home Savings Assn. of Dallas County to Casa Claire Apartments, the owner-sponsor of a 160-unit project to be built in Mesquite, Texas. At the "initial closing" twenty-two documents were executed. These included a building loan agreement on a HUD-prescribed form, which provided as follows:

> The Borrower shall make monthly applications on FHA Form No. 2403 for advances of mortgage proceeds from the Lender. Applications for advances with respect to construction items shall be for

amounts equal to (i) the total value of classes of the work acceptably completed; plus (ii) the value of materials and equipment not incorporated in the work, but delivered to and suitably stored at the site; less (iii) 10 percent (holdback) and less prior advances....

Upon completion of the improvements, ... the Borrower shall furnish to the Lender and the [Federal Housing] Commissioner satisfactory evidence that all work requiring inspection by municipal or other governmental authorities having jurisdiction has been duly inspected and approved by such authorities and by the rating or inspection organization, bureau, association or office having jurisdiction; and that all requisite certificates of occupancy and other approvals have been issued. The balance due the Borrower hereunder shall be payable at such time after completion as the commissioner authorizes the release of the holdback. However, the Lender may withhold final payment until after the expiration of any period which mechanics and materialmen may have for filing liens.

The value of the HUD-insured mortgage was $2,143,000.

Van-Tex, Inc., was designated the general contractor. Because B.L. Nelson was both a 5 percent general partner in Casa Claire Apartments and the 91 percent stockholder in an entity that owned 80 percent of Van-Tex, "an identity of interest" was created between the owner-sponsor and the contractor. As a result, HUD required the construction contract to be on a cost-plus basis with the contractor's costs to be certified. See 24 C.F.R. §§ 221.548(c)(1), 221.551(a). In identity of interest cases, however, HUD also permits the owner-sponsor and the contractor to waive the Builder's and Sponsor's Profit and Risk allowance, thereby minimizing the up-front money needed. For this reason many § 221(d)(4) participants deliberately choose to have an identity of interest. Casa Claire Apartments and Van-Tex did so here.

At the initial closing Casa Claire Apartments and Van-Tex entered into the cost-plus construction contract on yet another HUD-prescribed form. That contract contained a holdback provision in large part mirroring the provision in the building loan agreement:

Subject to the approval of the Lender and the Commissioner, the Contractor shall be entitled to payment thereon in an amount equal to (1) the total value of classes of the work acceptably completed; plus (2) the value of materials and equipment not incorporated in the work, but delivered to and suitably stored at the site; less (3) 10 percent holdback and less prior payments....

The balance due the Contractor hereunder shall be payable upon the expiration of 30 days after the work hereunder is fully completed, provided the following have occurred:

(1) All work hereunder requiring inspection by municipal or other governmental authorities having jurisdiction has been inspected and approved by such authorities...

(2) All certificates of occupancy, or other approvals, with respect to all units of the project have been issued by State or local governmental authorities having jurisdiction; and

(3) Permissions to occupy (FHA Form No. 2485) for all units of the project have been issued by the Commissioner.

After the initial closing Casa Claire Apartments assigned its assets and liabilities to Casa Claire Apartments, Ltd., a limited partnership in which B.L. Nelson remained a 5 percent general partner. The mortgage was assigned to Metropolitan Savings Bank of Brooklyn, New York, although Home Savings Assn. remained the servicing agent.

Construction began in 1971 and continued into the following year. Home periodically advanced construction funds to Van-Tex less the 10 percent retainage. By April 25, 1972, a HUD inspector certified that construction was 99.7 percent complete. The last disbursement of mortgage proceeds occurred on June 27, 1972. HUD determined the date of substantial completion to be August 29.

Meanwhile, however, the owner-sponsor had failed to make monthly interest payments. On August 17, Home sent HUD a notice of default indicating that Casa Claire had failed to meet payments for May, June, and July. Additional notices of default followed. Finally, by letter of December 1, Home as servicing agent for Metropolitan informed HUD that it was exercising its option to foreclose on the apartment project. Two months later Metropolitan took possession of the project and began to operate it. Later in 1973 it deeded the property to HUD, and received $1,884,-465.80 plus interest as mortgage insurance. HUD eventually sold the project for $1,200,-000.

This appeal is concerned with the construction holdbacks. When Van-Tex finished construction, they amounted to $186,-590.14. Because of Casa Claire's default, the holdback was never paid out. HUD refused to insure the disbursement, so Metropolitan and Home refused to disburse this amount from the mortgage proceeds.

This vintage lawsuit, now entering its tenth year, was brought by Industrial Indemnity as surety of Van-Tex. Industrial Indemnity claimed it was entitled to recover the retainage from HUD as a third-party beneficiary of the building loan agreement, HUD having inherited the mortgagee's duties. Industrial Indemnity also claimed it was entitled to recover on the basis of unjust enrichment in that Van-Tex did all it was supposed to do, while HUD got a housing project without paying full costs of construction. Because some of the construction costs were disallowed by HUD, the parties have stipulated that if any money is owed to Industrial Indemnity by HUD, that amount is $148,849.

The district court first ruled that it had no subject-matter jurisdiction because HUD was immune from suit. We reversed and remanded. *Industrial Indemnity, Inc. v. Landrieu,* 615 F.2d 644 (5th Cir.1980). The

district court then entered summary judgment for Industrial Indemnity, holding that recovery was appropriate on both third-party beneficiary and unjust enrichment grounds. This appeal by HUD followed.

## UNJUST ENRICHMENT

### Trans-Bay *and Its Progeny*

Although we have not found any cases decided by other circuits involving contractors' claims to retainages on defaulting § 221(d)(4) projects, another HUD program, § 236 low-income housing, has been a steady source of litigation. The leading case of *Trans-Bay Engineers and Builders, Inc. v. Hills,* 551 F.2d 370 (D.C.Cir.1976), held that a general contractor on a housing project financed pursuant to § 236 was entitled to recover holdback amounts from HUD both as a third-party beneficiary and on the theory that "the Secretary has been unjustly enriched by the value of Trans-Bay's uncompensated construction services." *Id.* at 381.[1] In *Trans-Bay* the contractor had signed a HUD-prescribed construction contract identical to the one involved here. When construction was complete, HUD refused to authorize release of half of the holdback until after final closing. Before that occurred, the owner-sponsor, a non-profit consortium, went into default. HUD foreclosed and Trans-Bay brought its claim for the rest of the holdback.

In approving Trans-Bay's equitable theory of recovery, the D.C. Circuit reasoned that it was "neither fair nor realistic to treat HUD as a mere mortgage insurer in this transaction, defining its exposure solely on the basis of the mortgage insurance document." *Id.* at 381. The court continued:

This was not a typical marketplace transaction where the contractor relied on the reputation and financial integrity of the owner to pay the construction costs. The owner here was a non-profit community based organization without any signifi-

---

1. The court did remand for a determination whether a substantial breach of the building loan agreement had occurred prior to Trans-Bay's completion of the project, thus defeating the third-party beneficiary claim, and for a determination whether Trans-Bay had been guilty of "unclean hands" so as to bar recovery on unjust enrichment grounds. *Id.* at 383.

cant assets, a fact known to all parties. The court put it pithily in *F.W. Eversley & Co. v. East N.Y. Non-Profit HDFC,* 409 F.Supp 791, 796–97 (S.D.N.Y.1976): These 'non-profit, no asset corporations were "creatures of HUD." ' They are not ordinary private commercial ventures, but products of and means for government programs. They were created and fully financed to carry out a government inspired social purpose of rehabilitating and constructing housing for low income families. . . .

Trans-Bay claims that it had been led to expect that HUD would make good on any sums rightfully due it under the construction contract. We see little that would lead to a contrary expectation. *Id.* at 381–82. The court concluded, "A court of equity has the power to forestall a cosmetic fraud based on the niceties of the contractual arrangements constructed by HUD, and to avoid unjust enrichment from the services rendered." *Id.* at 382.

Other circuits have followed the D.C. Circuit's lead. In *Spring Construction Co. v. Harris,* 562 F.2d 933 (4th Cir.1977), the Fourth Circuit held that a contractor on a federally-insured low income housing project [2] was entitled to recover from HUD retainage it had never been paid because HUD "shut down" the project by withdrawing mortgage insurance over a sewer line dispute. The court upheld the contractor's equitable theory of recovery: "The plaintiff asserts many different factual reasons why an equitable lien here attaches, but the most persuasive theory is that defendant will be unjustly enriched if it is not required to compensate plaintiff for the work performed." *Id.* at 937. In *S.S. Silberblatt, Inc. v. East Harlem Pilot Block,* 608 F.2d 28 (2d Cir.1979), the Second Circuit held that a contractor on a defaulting § 236 project assigned to HUD could recover retainage from HUD "on a theory of quantum meruit based on unjust enrichment." *Id.* at 35. The court reasoned:

Appellant is not a small unsophisticated firm with no realistic choice but to do business on the terms dictated to it. It was presumably capable of evaluating the risks of contracting with East Harlem and decided the risk did not outweigh the potential value of the contract to it. On the other hand, if appellant, despite the formal contractual structure erected by HUD in an effort to insulate itself from liability, was in fact doing business with HUD's creature, East Harlem, at least since the assignment of the mortgages to HUD, justice would dictate that the rather transparent veil created by HUD be pierced to permit a decision based on substance rather than form.

*Id.* at 40.

We think these are sound principles. The question is whether they apply here.

### Sovereign Immunity

In its first assault on the district court's ruling on unjust enrichment, HUD argues that subject-matter jurisdiction was lacking over Industrial Indemnity's unjust enrichment claim because 12 U.S.C. § 1702, which authorizes the Secretary "in carrying out the provisions of [the National Housing Act], in his official capacity, . . . to sue and be sued in any court of competent jurisdiction . . . ," does not permit suits "not based on pre-existing obligations to pay money." Without explaining what this phrase means, HUD contends that Industrial Indemnity's claim is not based on such an obligation, and is therefore barred by sovereign immunity.

■ We are not impressed by HUD's effort to relitigate a question resolved in the prior appeal. There we held that a "[s]uit by a building contractor's surety and assignee over payment for construction work on a housing project insured by the Secretary in a program authorized by the National Housing Act clearly satisfies" 12 U.S.C. § 1702. *Industrial Indemnity, Inc. v. Landrieu,* 615 F.2d at 647. HUD argues that

**2.** The opinion does not say what section of the National Housing Act furnished the authority for the housing project in question. *Id.* at 935.

we were only deciding the district court's jurisdiction over the third-party beneficiary claim, but we discern no such limiting language in the opinion, which quite clearly reversed and remanded for a determination of the merits of *both* claims.

Nor do we read *Lomas & Nettleton Co. v. Pierce,* 636 F.2d 971 (5th Cir.1981), and *Southern Sog, Inc. v. Roland,* 644 F.2d 376 (5th Cir.1981), as limiting the scope of our earlier opinion. In those cases we pointed out that 12 U.S.C. § 1702 does not confer jurisdiction where the source of damages would be the United States Treasury. 636 F.2d at 973, 644 F.2d at 379. But nothing in *Industrial Indemnity, Inc. v. Landrieu,* 615 F.2d 644, runs to the contrary. There we emphasized that a judgment in favor of Industrial Indemnity would be paid out of the General Insurance Fund, "a separate fund in the control and possession of the Secretary." *Id.* at 646.

### § 221(d)(4) vs. § 236

HUD argues more persuasively that principles developed in § 236 litigation should not be applied to § 221(d)(4) cases, because § 221(d)(4) owner-sponsors are profit-making, not "creatures of HUD." As HUD notes, in *Trans-Bay* and succeeding cases the impoverishment of the owner-sponsor has been a significant justification for allowing recovery against HUD:

> We do not hold that a governmental agency or administrator would be liable for unpaid sums any time the agency or administrator insures a mortgage. Most such projects involve presumptively credit worthy owners in traditional marketplace activities. There, the contractors rely on their own assessment of the owner's solvency, and take their contractual chances as they see fit.

> But here, the no-asset owner was created and permitted to enter into the agreements for the convenience of the government in effectuating the section 236 program.

*Trans-Bay,* 551 F.2d at 382. At least one court has denied unjust enrichment recovery from HUD where the § 236 owner-

sponsor was not *sans sou.* In *Taylor Woodrow Blitman Const. Corp. v. Southfield Gardens Co.,* 534 F.Supp. 340 (D.Mass.1982), the court held that "the credit-worthy nature of Southfield [the owner of the project] precludes recovery based on unjust enrichment." *Id.* at 347. In addition, in *Berks Products Corp. v. Landreau* (sic), 523 F.Supp. 304 (E.D.Pa.1981), which involved a § 221(d)(4) project, the court held that it was without subject-matter jurisdiction and in dictum added, "Moreover where, as here, HUD is not in privity of contract with any of the plaintiffs, several solvent defendants with direct contractual liability to plaintiffs exist and plaintiffs have a contractual remedy for violations of any bona fide duty of HUD to them, the necessity of going against HUD under a quasi-contractual theory is obviated." *Id.* at 312 n. 6.

HUD emphasizes that B.L. Nelson was a general partner in Casa Claire and presumably someone whom Van-Tex or Industrial Indemnity could have looked to for payment of the retainage. In addition, James D. Crow, the largest general partner in Casa Claire, filed a financial statement when he applied for the insurance commitment showing a net worth of $2,345,016.

There are similarities in the administration of the § 221(d)(4) and § 236 housing programs. Both programs are subject to HUD regulation of rents and charges. *See* 24 C.F.R. §§ 221.531(c), 236.55. Although § 221(d)(4) mortgagors are technically eligible for only 90 percent financing, while § 236 mortgagors receive 100 percent, HUD concedes that the "identity of interest" device, which was used here, enables the mortgagor to stretch its financing to 97–98 percent. In addition, because § 221(d)(4) mortgagors have no personal liability on the mortgage note, the sole security for HUD is the project itself.

Further, in both § 221(d)(4) and § 236 projects the contractor is prohibited from filing mechanics' and materialmen's liens. HUD regulations require the building loan agreement to contain a covenant against the creation by the mortgagor of liens against the property. 24 C.F.R. § 221.520.

The HUD-prescribed building loan agreement in this case authorized the lender to "withhold final payment until after the expiration of any period which mechanics and materialmen may have for filing liens." The HUD-prescribed construction contract waived the contractor's right to file mechanics' or materialmen's liens.

Trans-Bay and later cases arguably tolerate an extension of their principles to § 221(d)(4) cases on this basis alone. Here, as in Trans-Bay, the contractor is "unable to consider the mechanic's lien available in ordinary commerce." 551 F.2d at 382. Similarly, in S.S. Silberblatt the Second Circuit emphasized both the financial impecunity of the owner and the unavailability of liens in approving the contractor's theory of unjust enrichment. 608 F.2d at 33.

Still, the unarticulated premise of unjust enrichment and the central issue here must be whether HUD created in the contractor a reasonable expectation that HUD would make good on any sums rightfully due it under the construction contract and was as a result unjustly enriched. See Trans-Bay, 551 F.2d at 382. When other remedies are available, the basis for such an expectation, and for a conclusion that HUD was responsible for it, becomes attenuated. The prohibition against filing liens only deprived the contractor of one of its two traditional remedies. So long as the owner-sponsor, unlike the typical § 236 owner-sponsor, had assets, the contractual remedy remained presumptively available.

■ Industrial Indemnity emphasizes that we did not have an owner and a contractor dealing at arm's length. To the contrary, B.L. Nelson was both the controlling stockholder in Van-Tex and a general partner in Casa Claire. Industrial Indemnity argues that Van-Tex could not realistically have been anticipating payment in the event of a mortgage default from an entity 5 percent of whose liabilities in excess of partnership assets were funded by Van-Tex's controlling stockholder. Yet merely to state this argument is to refute it. The other 95 percent of Casa Claire's liabilities in excess of partnership assets were the

responsibility of presumptively solvent parties with no connection to Van-Tex. This was not a situation as described in S.S. Silberblatt, Inc. v. East Harlem Pilot Block, where the contractor "looks only to the mortgage proceeds for payment for the materials and services he provides." 608 F.2d at 33. Accordingly, we hold that unjust enrichment cannot provide a basis for Industrial Indemnity's recovery of retention amounts from HUD.

In Trans-Bay the D.C. Circuit reached a different result than we do but nonetheless held, "[E]quity would require the assignment to the Secretary of any rights of Trans-Bay [the contractor] remaining against MORH [the owner-sponsor] after the imposition of the equitable lien on the Secretary." 551 F.2d at 382 n. 32. Even if we followed the Trans-Bay court's approach here, HUD would be able to turn around and sue Casa Claire. Where it was the reasonable expectation all along that Casa Claire would be the ultimate guarantor of the holdbacks, we see no reason to create a Sieracki-Ryan-like circle of liability.

## THIRD–PARTY BENEFICIARY

### Trans-Bay Revisited

In Trans-Bay, as we have noted, the D.C. Circuit also upheld contractor recovery from HUD on a third-party beneficiary theory. It acknowledged that a third-party beneficiary was "bound by the terms and conditions of the contract that it invoked." Id. at 378. But it interpreted one provision in the building loan agreement, "[t]he balance due the Borrower hereunder shall be payable at such time after completion as the commissioner authorizes the release of the holdback," as requiring release of the holdback as soon as the conditions for release in the construction contract had been met. Thus, the absence of a final closing was found to be no bar to recovery of the retention amounts. Id. at 378–79. The building loan agreement was in all material respects identical to the building loan agreement here. Id. at 378.

In the *Trans-Bay* court's view, a default by the mortgagor could bar third-party beneficiary recovery by a contractor, because it would be a breach of the building loan agreement. *Id.* at 379–80. But the default must have occurred before completion of the project and the fulfillment of the other conditions in the construction contract; otherwise, the contractor's right to the retainage would already have "vested." *Id.* at 380. There is no mystery to the *Trans-Bay* court's concept of "vesting." If the *Trans-Bay* court was correct in reading the building loan agreement as requiring payment of the full retention amount as soon as the project had been finished and the other conditions in the construction contract had been met, then the mortgagee's failure then to pay the holdback materially breached the loan agreement, a circumstance not altered by a later failure of the owner to make the mortgage payment. The *Trans-Bay* court remanded for the district court to determine which occurred first—default by the owner or the contractor's satisfaction of the conditions in the construction contract. *Id.* at 383.

Other courts have adopted the *Trans-Bay* analysis. In *Spring Construction Co. v. Harris,* 562 F.2d 933 (4th Cir.1977), the Fourth Circuit, emphasizing the importance of HUD's own regulations, concluded that the contractor there was a third-party beneficiary of the building loan agreement. As the court noted, 24 C.F.R. § 221.512 provides:

> The mortgagee shall be obligated, as a part of the mortgage transaction, to disburse the principal amount of the mortgage, to, or for the account of the mortgagor or to his creditors for his account and with his consent.

The court conceded that as a general principle, "the ultimate incompleteness of the contract bars recovery." In the particular case, however, HUD had encouraged the contractor to continue construction. By this course of conduct it had "implicitly, if not explicitly, waived such a defense of nonperformance." *Id.* at 937. Other cases upholding the theory of third-party beneficiary recovery along similar guidelines include *Mursor Builders v. Crown Mountain Apartment Associates,* 467 F.Supp. 1316, 1334–1335 (D.V.I.1978) (equitable considerations in the particular case held to bar third-party beneficiary recovery), and *Bennett Construction Co. v. Allen Gardens, Inc.,* 433 F.Supp. 825, 832–834 (W.D.Mo.1977) (mortgagor's default did not bar third-party beneficiary recovery where contractor had been requested to complete construction). *But see Taylor Woodrow Blitman Construction Corp. v. Southfield Gardens Co.,* 534 F.Supp. 340, 343–346 (D.Mass.1982) (§ 236 contractor not third-party beneficiary of building loan agreement).

### Borrower Default

Waltzing around the issue of whether a contractor can be a third-party beneficiary of the building agreement, we are left to tango with the matter of Casa Claire's default. Whenever the lender's contractual duty to release the holdbacks *does* arise (or "vests"), another issue we need not decide, it does not arise until construction has been completed. Yet here it is undisputed that Casa Claire defaulted before Van-Tex finished the project.

Despite the default, however, neither the mortgagee nor HUD terminated the building loan agreement. Van-Tex kept working on the project, which was completed in August 1972, approximately three months after the first default. Industrial Indemnity argues that under the terms of the building loan agreement, the lender must continue to advance mortgage proceeds to the contractor unless it has terminated the agreement. The provision of the agreement it relies upon states as follows:

> If the Lender elects not to terminate this agreement, it may enter into possession of the premises and perform any and all work and labor necessary to complete the improvements ... All sums so expended by the Lender shall be deemed to have been paid to the Borrower and secured by the Mortgage. For this purpose, the Borrower hereby constitutes and appoints the Lender its true and lawful attorney-in-fact, with full power of substitution in

the premises, to complete the project in the name of the borrower. . . . The Borrower hereby assigns and quitclaims to the Lender all sums unadvanced under the Mortgage and all sums due in escrow conditioned upon the use of said sums for the completion of the project, such assignment to become effective only in case of the Borrower's default.

We do not read this provision to *require* the mortgagee to take possession and complete the project if it does not terminate, given the use of the permissive "may." Thus, we do not think that by failing to terminate the building loan agreement the lender incurred a contractual obligation to disburse the holdbacks to the contractor regardless of the mortgagor's default.

In *Travelers Indemnity Co. v. First National State Bank of New Jersey,* 328 F.Supp. 208 (D.N.J.1971), the court did read a similar provision as giving the mortgagee only two "alternative courses of action, termination of the agreement or completion of the project." *Id.* at 213. Because "the mortgagee elected neither alternative, since the project was substantially completed, and stood idly by as the project's completion was effectuated," the court concluded that HUD was liable to the general contractor's successors and assignees on a third-party beneficiary theory for the sum of the unadvanced proceeds. *Id.* at 213–214. The court's interpretation of the building loan agreement may have been guided by the equitable consideration, not present here, that the contractor there had no notice of the default. *Id.* at 213. In any event, we disagree with it.

### Waiver

Industrial Indemnity also maintains that as in *Spring Construction* HUD waived the defense of nonperformance because it "encouraged continued construction even though it had knowledge of the very condition which eventually led to the shutdown of the project." 562 F.2d at 937. Van-Tex's controlling stockholder testified that a HUD official told him in June 1972, after the first default had occurred, that he would be paid by Casa Claire. There is no testimony, however, that the HUD official indicated that *HUD* would pay the contractor. In *Spring Construction,* it must be remembered, the court sustained recovery on the basis of unjust enrichment as well as third-party beneficiary. *Id.* at 937–938. Here, however, we have concluded that Van-Tex did not have a reasonable expectation at the outset that HUD would pay the retainage in the event of mortgage default. If that is so, it is difficult to see how a HUD official's statement that *Casa Claire* would pay could be interpreted as such a promise.

In a somewhat related argument, Industrial Indemnity asserts that HUD and the mortgagee waived the defense of nonperformance by accepting Van-Tex's continued construction of the apartment project with reason to know of Casa Claire's default. The district court took this position, relying on § 298(1) of the original Restatement of Contracts which provides that a "promisor's duty is not discharged by the defective performance of a condition or of a return promise if he accepts the performance with knowledge of or reason to know of the defects." Other courts have followed the same logic. *See Bennett Construction Co. v. Allen Gardens, Inc.,* 433 F.Supp. at 834; *American Fidelity Fire Insurance Co. v. Construcciones Werl,* 407 F.Supp. 164, 182 (D.V.I.1975). The new Restatement provides, "[A]n obligor's acceptance or his retention for an unreasonable time of the obligee's performance, with knowledge of or reason to know of the non-occurrence of a condition of the obligor's duty, operates as a promise to perform in spite of that non-occurrence . . ." Restatement (Second) of Contracts § 246(1) (1981).

█ Applying this concept of acceptance of defective performance is problematical here, for there are really two distinct performances in question—the construction of the apartment project and the making of the mortgage payments. To say that HUD or the lender's acceptance of the first performance is sufficient to make it liable for the holdbacks is in effect to hold that the

retention amounts are security only for the construction work, not for the repayment of the loan. Yet we have already concluded that the contractor looked at the beginning of the project to the owner-sponsor for payment of the retainage; we have held, in other words, that the building loan agreement holdbacks were security both for the construction of the apartment complex and for the loan payments. We are reluctant to conclude that this mutual understanding was altered without some express statement. There was no such express statement here, only testimony that a HUD official promised Van-Tex it would be paid by Casa Claire and a failure on the part of HUD or the bank to prevent the contractor from finishing the project it had nearly completed at the time of the initial default. Thus we are compelled to hold, as a matter of law, that HUD and the lending bank did not waive the defense of nonperformance.

### Conclusion

In our view Van-Tex did not have a reasonable expectation that HUD would pay the holdbacks in the event of mortgage default. We then cannot agree with the district court's ruling on unjust enrichment. In our view the owner's default was a breach of the building loan agreement and because neither HUD nor the lender waived the legal effects of this breach, we cannot agree with the court's ruling on third-party beneficiary as well. As a matter of federal common law, *see Industrial Indemnity, Inc. v. Landrieu,* 615 F.2d at 647, we hold that recovery must be denied to Industrial Indemnity on either unjust enrichment or third-party beneficiary grounds. The judgment in favor of Industrial Indemnity is reversed.

REVERSED.